# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-14-00257-CV
---

**Maverick County, City of Eagle Pass, Maverick County Hospital District, Maverick County Environmental and Public Health Association, and George Baxter, Appellants**

**v.**

**Railroad Commission of Texas, Dos Republicas Coal Partnership, Camino Real Fuels, LLC; and North American Coal Company, Appellees**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. D-1-GV-13-000416, HONORABLE DARLENE BYRNE, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

Maverick County, the City of Eagle Pass, Maverick County Hospital District, Maverick County Environmental and Public Health Association (MCEPHA), and George Baxter appeal the district court's judgment affirming the Railroad Commission's order granting the application of Dos Republicas Coal Partnership (DRCP) for renewal, revision, and expansion of its surface coal mining and reclamation permit. Appellants participated in the contested case hearing as protestants against the permit and, following the grant of the permit, filed three separate suits for judicial review that were consolidated.[1] DRCP, the mine owner; The North American Coal Corporation (NACC); and Camino Real Fuels, LLC, (CRF), a subsidiary of NACC and the mine

---

[1] The Kickapoo Traditional Tribe of Texas initially participated as a party but later withdrew.

operator (collectively Intervenors), intervened to defend DRCP's permit. For the reasons that follow, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1994, the Commission approved the application of DRCP's predecessor in interest, Dos Republicas Resources Company (DRRC), for a surface coal mining and reclamation permit. In 2000, the Commission issued the permit.[2] The permit was to expire in three years if mining had not begun, subject to exceptions that excuse failure to begin mining in certain circumstances. *See* Tex. Nat. Res. Code § 134.072. In 2003, DRRC sought an extension of the permit, and in early 2004, the Commission invoked an exception and renewed the permit until April 11, 2005, which led to litigation. In October 2004, DRRC filed an application for renewal and revision of the permit, but the renewal process was abated pending resolution of the litigation on the 2004 renewal. On April 10, 2005, one day before the permit was to expire, DRRC initiated construction on a sedimentation pond. In 2007, this Court upheld the 2004 renewal.[3] In 2008, DRRC filed a "complete replacement" of the 2004 application and sought a renewal, revision, and expansion of the permit area. This "replacement" was "Supplement No. 1." In January 2009, DRRC transferred the permit to DRCP. DRCP filed five additional supplements, substantially revising the 2008 application.

---

[2] For reasons not reflected in the record, DRRC did not request that the permit be issued until 2000.

[3] *See Railroad Comm'n v. Coppock*, 215 S.W.3d 559 (Tex. App.—Austin 2007, pet. denied).

Public participation was initiated in June 2011. Numerous persons contested the permit, and a contested case hearing was held for 19 days between January and May 2012. Following the hearing, the hearing examiner issued a proposal for decision (PFD), subsequently amended, recommending approval of the permit with conditions. The Commission issued its final order adopting the amended PFD and approving the permit in January 2013. Appellants filed motions for rehearing and motions under Commission Rule 12.222 requesting a hearing on the reasons for the decision. *See* 16 Tex. Admin. Code § 12.222 (Railroad Comm'n of Tex., Administrative Review).[4] The Commission denied the motions for rehearing and the motions under Commission Rule 12.222. Appellants sought rehearing of the decision on their Rule 12.222 motions and were notified by the examiner that no further action would be taken. The district court upheld the Commission's order, and this appeal followed.

## STANDARD OF REVIEW

We review the Commission's decision under the "substantial evidence" standard. *See* Tex. Gov't Code § 2001.174; *Railroad Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792–93 (Tex. 1995) (applying substantial evidence standard of Administrative Procedure Act (APA) to Commission decision). This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (A) in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; (C) made through unlawful procedure;

---

[4] All cites to Title 16 of the Texas Administrative Code are to rules issued by the Texas Railroad Commission.

3

(D) affected by other error of law; (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code § 2001.174(2). In reviewing fact-based determinations under this standard, we may not substitute our judgment for that of the agency but rather must determine whether, considering the reliable and probative evidence in the record as a whole, some reasonable basis exists in the record for the agency's action. *See id.* § 2001.174(2)(E); *Texas Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 105 n.60 (Tex. 2010). "Thus, the agency's decision will be sustained if the evidence is such that reasonable minds could have reached the conclusion the agency must have reached in order to justify its action." *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984). We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise. *See Froemming v. Texas State Bd. of Dental Exam'rs*, 380 S.W.3d 787, 790 (Tex. App.—Austin 2012, no pet.). We must affirm the agency's findings if they are supported by more than a scintilla of evidence. *Mireles v. Texas Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999) (per curiam).

The parties' issues also require us to construe applicable statutes and rules. Statutory construction is a question of law that we review de novo. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). Our primary concern is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). We apply the plain meaning of the text unless a different meaning is supplied by

4

legislative definition or is apparent from the context or the plain meaning leads to absurd results. *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010). "We generally avoid construing individual provisions of a statute in isolation from the statute as a whole[,]" *Texas Citizens*, 336 S.W.3d at 628, we must consider a provision's role in the broader statutory scheme, *see 20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008), and we presume that "the entire statute is intended to be effective," Tex. Gov't Code § 311.021(2). We construe administrative rules in the same manner as statutes. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011).

## DISCUSSION

**Denial of the County's Motion to Compel Disclosure**

The County, in its first issue, and the City and the Hospital District, in their issue II(D) and (E), argue that the hearing examiner abused her discretion in denying the County's motion to compel disclosure of documents sought by the Kickapoo Tribe prior to its withdrawal from the proceeding. The Kickapoo Tribe served DRCP with a request for disclosure under Rule 194 of the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 194.2. DRCP partially responded to the request, and the County moved to compel disclosure of all documents, tangible things, reports, models, or data reviewed by or prepared by or for DRCP's experts in anticipation of their testimony. *See id.* R. 194.2(f))(4)(A). The hearing examiner granted the motion and ordered DRCP to supplement its responses to the Kickapoo Tribe's request for civil procedure Rule 194.2(f) disclosures. DRCP produced some documents and withheld others that were described on a privilege log attached to its supplemental disclosures. The withheld documents were primarily communications among counsel

5

for DRCP and its 13 designated expert witnesses, which DRCP contended were protected by the attorney-client and work product privileges.

The County filed a second motion to compel, seeking disclosure of 120 of the 137 documents listed on the privilege log.[5]  The County argued that they were discoverable under civil procedure Rules 192.3(e)(6) and 194.2(f)(4)(A) and the supreme court's decision in *In re Christus Spohn Hospital Kleberg*, 222 S.W.3d 434 (Tex. 2007) (orig. proceeding).  *See* Tex. R. Civ. P. 192.3(e)(6) (providing that party may discover all documents, tangible things, reports, models, and data compilations that have been provided to, reviewed by, or prepared by or for expert in anticipation of testimony), 194.2(f)(4) (providing that party may request disclosure of same); *Christus Spohn*, 222 S.W.3d at 438 (citing civil procedure Rule 192.5(c)(1) and holding that work product privilege does not protect documents provided to testifying expert).  In its response, DRCP argued that Commission Rule 1.81 does not contemplate civil procedure Rule 194 requests for disclosure, that the examiner has discretion to tailor discovery, and that communications with the experts were protected under section 2001.092 of the APA.  *See* Tex. Gov't Code § 2001.092 (providing for discovery of potential parties and witnesses and expert reports but excluding discovery of communications between agents, representatives, and employees of party and between party and its agents, representatives, and employees) (party-agent communications);  16 Tex. Admin. Code §§ 1.81(a) (Forms and Scope of Discovery in Protested Contested Cases) (listing forms of discovery but not including requests for disclosure), 1.85 (Discovery Orders) (providing that examiner may

---

[5]  Although the County asserts that DRCP withheld 138 documents, and DRCP states that it withheld 127, the privilege log reflects 137 withheld documents.

refuse to compel discovery for certain specified reasons or "other good cause in the interest of justice"). DRCP asked the examiner to deny the County's motion or, in the alternative, to review the documents in camera prior to ruling.

After a hearing, and without reviewing the documents in camera, the examiner issued an order denying the County's motion to compel without stating a reason, and the County filed an interlocutory appeal of the decision. In a memo to the Commission regarding the interlocutory appeal and in the amended PFD, the examiner cited APA section 2001.092 as the applicable statutory provision. Likewise, the Commission's Conclusions of Law Nos. 3 and 7 cite section 2001.092 as supporting its denial of the interlocutory appeal by operation of law.

On appeal, Appellants[6] argue that Commission Rule 1.81 provides that the scope of discovery in a hearing before the Commission shall be the same as under the Rules of Civil Procedure, that APA section 2001.092 does not supercede civil procedure Rule 194, and that under civil procedure Rules 192.3(e)(6), 192.5, and 194.2(f)(4)(A), documents provided to testifying experts are not protected. They also argue that as a result of the decision to deny disclosure, they were deprived of the ability to confront adverse witnesses and evidence and show the extent to which the experts' opinions were influenced by strategic litigation concerns. We construe this argument as a contention that the denial of disclosure probably caused the rendition of an improper judgment, thus establishing harm under appellate procedure Rule 44.1(a)(1). *See* Tex. R. App. P. 44.1(a)(1).

---

[6] For each issue, the term "Appellants" is used to refer collectively to those appellants who assert that issue and does not refer to any appellant that did not raise that issue. In addition to asserting its own seven issues, MCEPHA and Baxter adopt by reference the issues and briefing of other appellants. *See* Tex. R. App. P. 9.7 (any party may adopt by reference all or any part of brief filed by other party).

7

Relying on *Ford Motor Company v. Castillo*, Appellants also contend that the denial precluded them from presenting their case on appeal and that they have shown harm under Texas Rules of Appellate Procedure 44.1(a)(2). *See id.* R. 44.1(a)(2); *Castillo*, 279 S.W.3d 656, 667 (Tex. 2009) (when discovery is denied and evidence does not appear in record, it is impossible to determine harm and party is prevented from properly presenting case on appeal). Appellees argue that Commission Rule 1.81 does not contemplate requests for disclosure and provides that the scope of discovery is subject to the constraints of the APA, including section 2001.092, and that the examiner has discretion under Commission Rule 1.85 to deny discovery. Intervenors also assert, without explanation or citation to the record, that "each of the experts was an employee, agent, or representative of Intervenors or their subsidiaries" and that APA section 2001.092 does not require discovery of communications with persons with that status. *See* Tex. Gov't Code § 2001.092(c)(1), (2), (3)(B), (C) (excluding from discovery written communications between agents, representatives, or employees of party and communications between party and party's agent made after transaction on which contested case is based in connection with prosecution, investigation or defense of contested case). Further, appellees contend that the generalized allegations of harm are not sufficient to show harm under appellate procedure Rule 44.1(a).

We review rulings denying discovery for abuse of discretion. *Castillo*, 279 S.W.3d at 661. Appellees first argue that Commission Rule 1.81 does not contemplate civil procedure Rule 194 requests for disclosure. However, this Court has implicitly held that civil procedure Rule 194 requests for disclosure are a permissible tool in administrative proceedings. *See Grimes v. State*, No. 03-04-00154-CV, 2005 Tex. App. LEXIS 6963, at *14–15 (Tex. App.—Austin Aug. 26, 2005,

8

no pet.) (mem. op.) (holding that the Commission did not err in excluding evidence related to legal theory party failed to disclose in response to Rule 194 request for disclosure). In addition, prior to the dispute over its responses to the Kickapoo Tribe's requests, DRCP served its own requests for disclosure on other parties, and in its response to the County's motion to compel, stated that the examiner had exercised her discretion to allow such requests. We cannot conclude that Commission Rule 1.81 prohibited civil procedure Rule 194 requests for disclosure on the facts of this case.

Commission Rule 1.85 also gives the examiner discretion to refuse to order discovery under certain circumstances that are inapplicable in this case and "for other good cause in the interest of justice." 16 Tex. Admin. Code § 1.85(b) (Discovery Orders). Although the examiner's order did not expressly state any good cause as the basis for her ruling, the record reflects, and the parties agree, that the examiner based her ruling and the Commission based its denial of the County's interlocutory appeal on the provision of APA section 2001.092 protecting party-agent communications. Commission Rule 1.81 provides that discovery, although having the same scope as the Rules of Civil Procedure, is nonetheless subject to the constraints of the APA. *See id.* § 1.81(b). The plain language of APA section 2001.092 protects from discovery party-agent communications.[7] *See Marks*, 319 S.W.3d at 663 (we apply plain meaning of statutory text unless different meaning

---

[7] We do not find section 2001.092 to be ambiguous, as the County argues, and therefore do not consider the legislative history, as the County urges us to do. *See Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex. 2011) ("Statements made during the legislative process by individual legislators or even a unanimous legislative chamber are not evidence of the collective intent of the majorities of both legislative chambers that enacted a statute. . . . [T]he Legislature expresses its intent by the words it enacts and declares to be the law."); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) ("When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language.").

is supplied by legislative definition or is apparent from context or unless plain meaning leads to absurd results). Thus, to the extent the examiner applied APA section 2001.092(c)(1), (2), (3)(B) and (C) to protect from discovery DRCP's party-agent communications, she did not err in denying the motion to compel. The record reflects, and the County appears to concede, that seven of the 13 experts were agents or employees of DRCP or one of its subsidiaries.[8] We therefore conclude that as to those experts, the examiner did not err in denying the County's motion to compel.

However, the resumés and testimony of the experts reflect that the remaining six experts were not agents, representatives, or employees of DRCP or any of its subsidiaries but were merely contracting consultants.[9] As noted above, Intervenors assert that all of the experts were agents, representatives, or employees of Intervenors or their subsidiaries but offer no explanation and no citation to the record. In fact, the record shows that two of the remaining six were self-employed and four worked for Atkins Environmental or for Pastor, Behling & Wheeler, engineering and environmental consulting firms. Documents shared with these contracting experts are not protected by the attorney-client or work product privileges.[10] *See* Tex. R. Evid. 511(a)(1); *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 50 (Tex. 2012) (orig. proceeding) (party who voluntarily discloses privileged matter to third party waives privilege); *Christus Spohn*, 222 S.W.3d at 438. Because

---

[8] These expert witnesses were Andres Gonzalez-Saravia Coss, Charles Ettinger, Steven Kirk, Peter Nielson, Corey Sadowsky, Joel Trouart, and Simon Zula. Zula did not testify. Although the County states only that Zula did not testify, the administrative record does not include a transcript of Ettinger's testimony.

[9] The non-employee expert witnesses were Derek Green, Edward F. Janak, Jr., Leonard J. Mason, Eric Matzner, Patrick J. Murin, and Kirby Tyndall.

[10] According to the County, those witnesses participated in 82 of the 120 communications sought.

Commission Rule 1.81(b) makes the scope of discovery the same as under the Rules of Civil Procedure where not otherwise constrained by the APA, Rules of Civil Procedure 192.3(e)(6) and 194.2(f)(4) control as to the contracting expert witnesses, and the examiner abused her discretion in denying the County's motion to compel as to those witnesses.[11] *See In re Ford Motor Co.*, 442 S.W.3d 265, 269 (Tex. 2014) (orig. proceeding) (trial court abuses its discretion if it misinterprets or misapplies law).

We turn, then, to whether the Appellants have shown the requisite harm for reversible error as to the contracting experts. Even where a party has shown abuse of discretion in a discovery ruling, the complaining party must still show harm on appeal to obtain a reversal. *See* Tex. R. App. P. 44.1(a) (no judgment may be reversed unless court of appeals concludes error complained of probably caused rendition of improper judgment or probably prevented appellant from properly presenting case to court of appeals); *Castillo*, 279 S.W.3d at 667. The County contends that under *Castillo*, the very fact that discovery was denied and the evidence does not appear in the record has prevented appellants from presenting their case on appeal and establishes harm. *See* Tex. R. App.

---

[11] Further, the examiner ruled on the motion without reviewing the documents in camera and apparently without taking evidence on the status of the expert witnesses as DRCP's agents, representatives, and employees, which may itself constitute an abuse of discretion. *See Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012) (trial court abuses its discretion by ruling without supporting evidence); *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam) (trial court abuses discretion in refusing to conduct in camera inspection when such review is critical to evaluation of a privilege claim); *Weisel Enters., Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex. 1986) (orig. proceeding) (per curiam) (holding that trial judge who denies discovery in absence of evidence substantiating claim of privilege abuses discretion, that when claim for protection is based on attorney-client or work product privilege, documents themselves may be only evidence substantiating claim of privilege, that listing of documents under heading of "attorney-client" or "work product" was no evidence any particular document was privileged, and that trial judge abused discretion in denying discovery without in camera inspection).

11

P. 44.1(a)(2); *Castillo*, 279 S.W.3d at 667 (when discovery is denied and because of denial does not appear in record, determining harm from denial is impossible, and party is prevented from properly presenting case on appeal). However, the *Castillo* holding is not a per se rule. *See Davis v. American Cas. Co.*, No. 07-13-00190-CV, 2014 Tex. App. LEXIS 6103, at *13–14 (Tex. App.—Amarillo June 4, 2014, pet. denied) (mem. op.) (applying *Castillo* harm rule but declining to find harm from failure to rule on motion to compel discovery); *In re E.G.S.*, No. 11-12-00288-CV, 2014 Tex. App. LEXIS 213, at *4, 6–7 (Tex. App.—Eastland Jan. 9, 2014, no pet.) (mem. op.) (same as to denial of motion to compel); *In re Commitment of Weissinger*, No. 09-12-00486-CV, 2013 Tex. App. LEXIS 7819, at *10 (Tex. App.—Beaumont June 27, 2013, pet. denied) (mem. op.) (distinguishing *Castillo* and declining to apply *Castillo* as "per se rule"); *In re Commitment of Bunn*, No. 09-12-00349-CV, 2013 Tex. App. LEXIS 13502, at *2, 4 (Tex. App.—Beaumont October 31, 2013, no pet.) (mem. op.) (same). Although it is more difficult to prove harm in the absence of requested discovery, to construe the Texas Supreme Court's application of appellate procedure Rule 44.1(a) in *Castillo* as a per se rule would lead to the result that every ruling denying discovery would be reversible error.

In *Castillo*, Ford agreed to settle Castillo's claims during trial after the presiding juror sent a note to the court asking the maximum amount that could be awarded. 279 S.W.3d at 659. After interviewing the jurors and learning that they had decided the first liability question in Ford's favor and that the presiding juror sent the question without the knowledge of some jurors and over the objection of others, Ford did not fund the settlement. *Id.* at 659–60. Castillo filed a motion for summary judgment for breach of contract, and Ford sought to conduct discovery to determine the

motivation of the presiding juror and any outside influence that may have swayed her. *Id.* at 660. The trial court granted the summary judgment without allowing Ford to conduct discovery. *Id.* at 661. The court of appeals affirmed, holding that any error was harmless because Ford had ultimately conducted its own investigation. *Id.* The supreme court reversed, concluding that the lack of direct evidence about whether the presiding juror was subjected to outside influence probably prevented Ford from properly presenting its case on appeal. *Id.* at 667. Thus, in *Castillo*, Ford was precluded from conducting any discovery at all on the sole issue being adjudicated by summary judgment. *Id.*; *see Joki v. Springer*, No. 10-14-00154-CV, 2014 Tex. App. LEXIS 12353, at *3–5 (Tex. App.—Waco Nov. 13, 2014, no pet.) (mem. op.) (trial court's abuse of discretion in granting summary judgment on breach of contract action without first permitting any discovery was harmful error).

Here, Appellants were not precluded from conducting any discovery at all on the dispositive issues. DRCP produced numerous documents in response to the very request for disclosure at issue. In addition, the record reflects that Appellants obtained documents and cross-examined the experts at length concerning the substantive issues forming the basis of their opposition to the permit application. The discovery at issue here does not go to those issues—the heart of their opposition to the permit—and thus has not prevented them from presenting their case on appeal. *Cf. Castillo*, 279 S.W.3d at 667; *Joki*, 2014 Tex. App. LEXIS 12353, at *3–5. Further, although the County complains that it should not have had to depose all 13 experts, oral depositions of nonparties are permissible under Commission Rule 1.81, and there is nothing in the record to indicate appellants were precluded from taking depositions of the experts. *See* 16 Tex. Admin. Code

§ 1.81(a)(1). Therefore, Appellants had available alternate means of discovery that they did not pursue. *See In re Weissinger*, 2013 Tex. App. LEXIS 7819, at \*11 (unlike situation in *Castillo*, proposed requests for admission were in record, appellant was allowed to conduct discovery by other means, and any error in granting protective order was harmless); *see also El-Ali v. State*, 388 S.W.3d 890, 895 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (distinguishing *Castillo* on ground appellant was not wholly prohibited from conducting discovery). Thus, Appellants have not shown harm under appellate procedure Rule 44.2(a)(2).

Nor have Appellants shown how the examiner's refusal to compel disclosure resulted in harm within the meaning of Rule 44.1(a)(1). They argue that the ruling precluded them from effectively confronting adverse witnesses and questioning the experts about how "strategic litigation considerations" may have influenced their opinions—that is, "explor[ing] the extent to which the experts' opinions have been colored by interactions with legal counsel or the cautions of other authorities with more litigation experience." We recognize that when the County attempted to question the first called expert concerning documents listed on the privilege log, the examiner sustained DRCP's objections to that line of questioning and that subsequent questioning of the experts about emails listed on the privilege log, some of which appeared to reflect preparation for the hearing, yielded little information and was ultimately stopped when the examiner sustained DRCP's objections. However, the record shows that the County questioned only three expert witnesses about the communications and asked only if they recalled exchanging emails with other experts or counsel and if they recalled the content of the emails themselves or their attachments

14

while none of the other Appellants asked any such questions at all.[12]  None of them posed direct questions concerning how the witnesses prepared for testimony, other than inquiring about specific nonprivileged documents they prepared or reviewed, or concerning any strategic litigation considerations that may have influenced their opinions.  In other words, they did not ask the extent to which they had shared their opinions with other experts[13] or whether their opinions had been influenced by statements of other experts or suggestions from counsel, the questions they now claim they were precluded from asking—the basis for their alleged harm.

Appellants have failed to show how the examiner's refusal to compel disclosure of the communications precluded them from asking these direct questions or how the answers would have made a difference in the outcome.  *See In re E.G.S.*, 2014 Tex. App. LEXIS 213, at *6–7 (holding denial of discovery of financial documents harmless where appellant failed to establish what additional information would have shown).  Unlike in a jury trial, where juries see experts as "objective authority figure[s]" and "are prone to rely on them to tell them how to decide complex issues," *see Christus Spohn*, 222 S.W.3d at 440, in this contested case hearing an experienced hearing examiner with particular expertise in the subject matter was the trier of fact.  A hearing examiner is less likely than a jury to be inappropriately swayed by expert testimony or by evidence that counsel has assisted in preparation for testimony.  Thus, Appellants have not established that the ruling probably caused an improper judgment.  *See Guniganti v. C & S Components Co.*, 467

---

[12]  As noted above, the record does not contain a transcript of Ettinger's testimony.

[13]  The County did ask one witness if he had discussed an exhibit he prepared with other experts or counsel, but when he answered yes as to certain specifics of the exhibit, the County moved immediately into questions concerning emails and attachments.

15

S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding that ruling that kept issue from jury, alone, was insufficient to demonstrate such error probably caused rendition of improper judgment); *Davis*, 2014 Tex. App. LEXIS 6103, at \*13–14 (finding no harmful error where appellant failed to show how denial of discovery met appellate procedure Rule 44.1 standard or how denied discovery would have been sufficient to meet summary judgment burden).

We review the entire record to determine whether error has caused harm. *Discovery Operating, Inc. v. BP Am. Prod. Co.*, 311 S.W.3d 140, 165 (Tex. App.—Eastland 2010, pet. denied) (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001)). Reviewing the entire record here, although it is a close call, we cannot conclude that Appellants have shown that they were harmed by the examiner's refusal to compel disclosure of the requested documents. *See Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 645 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (finding no reversible error where appellant identified no harm suffered as result of denial of discovery). We overrule the County's first issue and the City's and the Hospital District's issue II(D) and (E).

**Refusal to Invoke "the Rule"**

In its second issue, the County argues that the examiner erred in refusing to invoke the Rule as to DRCP's experts. The City and the Hospital District assert the same argument in their issue II(B). "The Rule," embodied in Texas Rule of Civil Procedure 267 and Texas Rule of Evidence 614, provides that, at the request of a party, the trial court must order witnesses excluded from the courtroom so they cannot hear other witnesses' testimony. Among those excepted from the Rule are witnesses a party shows to be essential to the presentation of the case. *See* Tex. R. Civ.

16

P. 267(b); Tex. R. Evid. 614(c). The burden rests with the party seeking to exempt an expert witness from exclusion to establish that the witness's presence is essential. *Drilex Sys. v. Flores*, 1 S.W.3d 112, 117 (Tex. 1999). However, this burden is minimal. *See Burrhus v. M&S Supply, Inc.*, 933 S.W.2d 635, 643 n.7 (Tex. App.—San Antonio 1996, writ denied). MCEPHA moved to invoke the Rule, and DRCP objected. DRCP argued that its experts were needed to help counsel determine if there were other issues that needed to be put on the record and to prepare for and conduct cross examination. DRCP also argued that it was not necessary to exclude the experts because their opinions were stated in the application and if they varied from their previously stated opinions, they would be subject to impeachment. The examiner denied the motion to invoke the Rule as to all witnesses and allowed DRCP's experts to remain and hear the testimony of other witnesses.

Appellants argue that DRCP failed to make the showing necessary under civil procedure Rule 267 and evidence Rule 614 that the presence of the experts was essential. Relying on *Drilex* for the proposition that experts are not automatically excluded, *see* 1 S.W.3d at 118, they contend the requisite showing under Rules 267 and 614 requires more than argument by counsel. However, as the Texas Supreme Court in *Drilex* observed, "an expert witness may *typically* be found exempt," and Rules 267 and 614 "vest in trial judges broad discretion to determine whether a witness is essential." 1 S.W.3d at 118–19. Drilex offered no evidence or argument that its expert witness was essential to the presentation of its case; it merely asserted that experts are exempt per se. *Id.* at 119. The court noted that "courts have held that expert witnesses expected to testify in an expert capacity only, and not to the facts of the case, should typically be exempt so that they can form opinions based on more accurate factual assumptions" but held that nothing in Rules 614 or 267

17

suggests that all expert witnesses qualify for exemption. *Id.* at 118 & n.4. In contrast, DRCP offered argument that the experts' presence was necessary to assist counsel in presenting the case and examine witnesses and further pointed out that their opinions were fixed in the application, subjecting them to impeachment should their testimony differ.

The decision whether to permit the expert witnesses to remain was within the discretion of the examiner. *See id.* at 118–19; *Willet v. Cole*, 249 S.W.3d 585, 590 (Tex. App.—Waco 2008, no pet.); *see also Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 630 (6th Cir. 1978) (applying Federal Rule of Evidence 615 and holding that "where a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge, and should not normally be disturbed on appeal"). On this record, we cannot conclude that the examiner abused her discretion in declining to invoke the Rule. *See Morvant*, 570 F.2d at 630; *Drilex*, 1 S.W.3d at 118–19.

Further, even if we were to conclude that the examiner abused her discretion, Appellants have shown no harm. *See* Tex. R. App. P. 44.1 (a). They argue that their due process rights were prejudiced, in particular their rights to a fair adjudication and to conduct effective cross-examination.[14] However, the experts testified solely as to their opinions based on the facts and data present in the case. They were not fact witnesses whose recollections might have been colored by

---

[14] In all of their remaining issues, Appellants assert that their due process rights were violated. Because municipalities do not enjoy such rights, *see City of Port Arthur v. Southwestern Bell Tel. Co.*, 13 S.W.3d 841, 845 (Tex. App.—Austin 2000, no pet.) (citing *Proctor v. Andrews*, 972 S.W.2d 729, 734 (Tex. 1998)), we address the due process arguments only as to the other appellants.

accounts of prior witnesses. In fact, as noted above, their opinions had been previously presented as contained in the application, and any deviations would subject them to cross-examination and impeachment. The purpose of the Rule is to minimize witnesses' tailoring their testimony in response to that of other witnesses and to prevent collusion among witnesses testifying for the same side. *Drilex*, 1 S.W.3d at 116. Appellants have not shown how hearing the testimony of other experts influenced or changed any of the experts' opinions or allowed collusion among them; nor have they cited any testimony that differed from opinions stated in the application or that otherwise prejudiced them. Further, they were able to cross examine the experts extensively, with access to their previously produced reports. Therefore, Appellants have failed to establish that the outcome of the hearing would have been different had the experts been excluded or that they are prevented from presenting their case on appeal. Accordingly, even were we to find error, we would conclude that they have not shown any prejudice. *See* Tex. R. App. P. 44.1(a); *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1013 (5th Cir. 1986) (finding no prejudice from exemption for the Rule for experts who testified only as to their opinions based on facts and data and who would not be influenced by fact witnesses). We overrule the County's second issue and the City's and Hospital District's issue II(B).

**Denial of Commission Rule 12.222 Hearing**

In the County's third issue, the City's and Hospital District's issue II(F), and MCEPHA's and Baxter's second issue, Appellants argue that the Commission erred in failing to grant an administrative review hearing pursuant to Commission Rule 12.222. *See* 16 Tex. Admin. Code § 12.222 (Administrative Review). Commission Rule 12.222 provides that "[w]ithin 30 days

19

after the applicant or permittee is notified of the final decision of the Commission . . . , the applicant, permittee, or any person with an interest which is or may be adversely affected may request a hearing on the reasons for the final decision in accordance with this section." *Id.* Rule 12.222 also provides that the hearing shall begin within 30 days of the request and be of record and adjudicatory in nature and that the examiner from any previous hearing shall not preside. *See id.* § 12.222(1). A hearing under Rule12.222 is to be a full evidentiary hearing. *See id.* § 12.222(3). Following the issuance of the Commission's order, appellants filed motions for rehearing and motions for hearing under Commission Rule 12.222. The Commission determined that the motions under Rule 12.222 should be treated as motions for rehearing and denied all motions.

Appellants argue that Commission Rule 12.222 creates a right to a post-decision review hearing and that Commission Rule 12.223 makes participation in the hearing a requisite to appeal. *See id.* §§ 12.222, .223 (Judicial Review) (any applicant or person with interest and who participated in administrative proceedings shall have right to appeal). They contend that the federal government—which has delegated its exclusive authority over surface mining to the state, subject to the state's operating the program in accordance with federal law—required Commission Rule 12.222, the state acquiesced, and for the state to create an exception or disregard its own unambiguous rule is arbitrary and capricious. Appellants further contend that the Commission's determination that Rule 12.222 conflicts with the APA renders the rule meaningless and that a hearing under the rule can be conducted within the time frame for a ruling on a motion for rehearing. Moreover, they argue, Rule 12.222 contemplates the possibility of a second hearing because it prohibits an "examiner from any previous hearing on this matter" from presiding.

20

Regulation of surface coal mining and reclamation operations is vested in the federal government, which has delegated its exclusive authority to states that wish to assume exclusive jurisdiction. *See* 30 U.S.C. § 1253. A state's program must be approved as being no less stringent or effective than the minimum requirements of the federal Surface Mining Control and Reclamation Act (SMRCA). *See id.* In 1979, Texas declared its desire to assume exclusive jurisdiction under SMRCA in enacting the Texas Surface Mining Control and Reclamation Act (TSMRCA), *see* Tex. Nat. Res. Code §§ 134.002(5), .011(14), and the federal Office of Surface Mining and Reclamation and Enforcement, Interior (OSM) approved the program, *see* 45 Fed. Reg. 12,998 (Feb. 27, 1980) (codified at 30 C.F.R. pt. 943). In 1993, the Commission proposed amendments to its program that included deleting what are now sections 12.222 and 12.223 of the TSMRCA and replacing them with a provision that appeal and review of Commission actions would be governed by the APA. *See* 62 Fed. Reg. 14,311 (Mar. 26, 1997) (codified at 30 C.F.R. pt. 943). OSM notified the Commission of concerns with its proposed changes to administrative procedures—concerns that the amendments were less stringent than corresponding federal regulations. *See id.* at 14,312. The Commission revised its proposed amendments, withdrawing the proposed changes to administrative procedures, and OSM approved the amendments. *See* 62 Fed. Reg. 14,311, 32,687 (June 17, 1997) (codified at 30 C.F.R. pt. 943) (correcting effective date).

Commission Rule 12.222 tracks much of the language of the corresponding federal regulation in providing for a post-decision hearing. *See* 30 C.F.R. 775.11. Section 775.11 provides that within 30 days after notification of a decision, an interested person may request a hearing on the reasons for a decision on a permit application. *See id.* § 775.11(a). It further provides that

21

administrative hearings under state programs shall begin within 30 days after the request, be adjudicatory in nature, and be on the record, *see id.* § 775.11(b), and allows for discovery, evidence, and witnesses, *see id.* § 775.11(b)(3). However, the federal procedure contemplates a decision by the regulatory authority after only written comments and objections or, at most, an informal conference, and before any adjudicatory hearing. *See id.* §§ 773.6 (providing for public participation through informal conference by any person who may be affected by decision on permit application), .7 (providing regulatory authority will review application, written comments and objections, and records of any informal conference within reasonable time or within 60 days of informal conference if one is held), 775.11 (providing that within 30 days of decision interested person may request hearing on reasons), 775.11(b) (providing that no person who presided at the *informal conference* shall preside at the hearing on the decision). The federal procedure therefore also contemplates that the post-decision hearing is the only full evidentiary hearing.

In contrast, the TSMRCA provides that chapter 2001 of the APA governs permit applications and hearings except as provided in section 134.062. *See* Tex. Nat. Res. Code §§ 134.011(3) (granting Commission authority to conduct hearings under chapter 134 and section 2001), .013(b) (providing that process of issuing permits is subject to chapter 2001), .062 (setting out requirements relating to request for public hearing and notice), .064 (providing that chapter 2001 applies to permit applications under act except as to notice and hearing, which are governed by section 134.062). The APA provides for notice and the opportunity to participate in a contested case hearing with the right to conduct discovery and to present evidence and witnesses. *See generally* Tex. Gov't Code §§ 2001.051–.103. Following the contested case hearing, the agency renders a

22

decision.  *See generally id.* §§ 2001.141–.147.  Thus, prior to a Commission decision, interested persons are afforded a full evidentiary hearing.

We believe that to require a full evidentiary hearing under Commission Rule 12.222 following a contested case hearing under the APA would be an absurd result.  *See Marks*, 319 S.W.3d at 663.  Appellants argue on appeal that Rule 12.222 applies and that, under Commission Rule 12.223, seeking a Rule 12.222 hearing is an exhaustion requirement for judicial review.  However, the County argued before the examiner that Commission Rule 12.222 applies only in those situations in which no protestant had requested a contested case hearing and conditioned its request for a Rule 12.222 hearing on the Commission's determination that such a request was an appellate requisite.  Similarly, the other Appellants noted that the Commission does not generally consider a Rule 12.222 request for hearing to be a necessary prerequisite to appeal and posited the theory that Rule 12.222 is "simply a vestige of provisions in the federal laws pursuant to which the Commission was delegated authority over surface mining in Texas, and that this provision has been superceded by the APA."  And all Appellants observed that under TSMRCA section 134.064, APA chapter 2001 governs and that Commission Rule 12.222 contains "additional provisions . . . for a subsequent hearing."

An administrative rule may not impose additional burdens, conditions, or restrictions in excess of or inconsistent with relevant statutory provisions.  *Harlingen Family Dentistry, P.C. v. Texas Health & Human Servs. Comm'n*, 452 S.W.3d 479, 486 (Tex. App.—Austin 2014, pet. dism'd).  Further, "[a]n agency can adopt only such rules as are authorized by and consistent with its statutory authority."  *Railroad Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex.

23

1992). To interpret Rule 12.222 as requiring an evidentiary hearing here would impose the additional burden of a second full evidentiary hearing, *see Harlingen Family Dentistry*, 452 S.W.3d at 486, and be inconsistent with the provisions of the TSMRCA and the APA that provide for a full evidentiary hearing prior to an agency decision as opposed to after a decision as in the federal scheme, *see* Tex. Gov't Code § 311.021(2) (we presume entire statute is intended to be effective); *Texas Citizens*, 336 S.W.3d at 628 (we avoid construing provisions of statute in isolation); *20801, Inc.*, 249 S.W.3d at 396 (we consider provision's role in the broader statutory scheme). It would also be inconsistent with the federal regulations that contemplate only one full evidentiary hearing, if requested, after an agency decision based on the application, comments, and objections. Although OSM required the Commission to retain Rules 12.222 and 12.223, the federal agency acknowledged that regulation of surface coal mining and reclamation operations was under the APA when it approved the state program. *See* 45 Fed. Reg. 12,998, 12,999. On these facts, we cannot conclude that the Commission erred in treating the Rule 12.222 motions as motions for rehearing—as it did on the only prior occasion when faced with such a motion—and declining to grant appellants a second full evidentiary hearing under Rule 12.222.

Even if we were to conclude that the Commission decision was error, Appellants have shown no harm. *See* Tex. R. App. P. 44.1(a). They have asserted that the decision deprived them of due process but, having offered no discussion or analysis on this argument, have waived it. *See id.* R. 38.1(i). Even if they had not waived the argument, Appellants were afforded a full evidentiary hearing, and "due process requires but one adequate hearing in administrative proceedings." *Browning-Ferris, Inc. v. Johnson*, 644 S.W.2d 123, 127 (Tex. App.—Austin 1982, writ ref'd n.r.e.).

24

Further, Appellants simply incorporated by reference into their letter requests for Rule 12.222 hearings the arguments asserted in their motions for rehearing, which were ruled on separately, and thus they were not denied a post-decision hearing on those issues. We overrule the County's third issue, the City's and Hospital District's issue II(F), and MCEPHA's and Baxter's second issue.

**Allocation of Burden of Proof**

The City and Hospital District in their issue II(A) and MCEPHA and Baxter in their first issue, argue that the Commission's final order violates sections 134.072 and 134.075 of the TSMRCA and improperly shifted the burden of proof. *See* Tex. Nat. Res. Code §§ 134.072, .075. Section 134.072 provides that a permit terminates if the holder has not begun surface coal mining operations on or before the third anniversary of the date on which the permit period begins. *See id.* § 134.072(a). Section 134.075 provides that when a permit holder applies for renewal, the Commission shall renew it unless opponents establish certain facts. *See id.* § 134.075(b); *see also* 16 Tex. Admin. Code §§ 12. 227(a) (Permit Renewals: General Requirements) (valid, existing permit shall carry with it right of successive renewal), .230(a) (Permit Renewals: Approval or Denial) (upon completion of application and all required procedures Commission shall renew permit unless certain findings are made). Appellants contend that DRCP had not begun coal mining operations as defined by the TSMRCA, making the application a new application rather than a renewal. *See* Tex. Nat. Res. Code § 134.004(20) (defining surface coal mining operations). They further contend that the 2008 application "completely replaced" the 2004 application and sought revisions and expansion not contemplated by section 134.075. *See id.* §§ 134.076 (extension of permit must be made by application for another permit), .079 (permit holder may submit application

25

for permit revision).  Because section 134.075 places the burden of proof on opponents of renewal, while under section 134.066(a) the burden is on an applicant for a new permit, Appellants argue that the hearing examiner and Commission improperly shifted the burden of proof by treating the application as a renewal.  *See id.* §§ 134.066(a) (requiring applicant to meet six conditions for approval of permit), .075.  Consequently, they contend, the final order also violates Commission Rule 12.216, which requires that an application be complete and comply with the TSMRCA and Commission rules.  *See* 16 Tex. Admin. Code § 12.216(1) (Criteria for Permit Approval or Denial).

Section 134.004(20) defines "surface coal mining operations" as:

(A) activities conducted on the surface of land in connection with a surface coal mine or subject to the requirements of Section 134.015 incidental to an underground coal mine, including excavation for the purpose of obtaining coal, including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining, the use of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal at or near the mine site; excluding the extraction of coal incidental to the extraction of other minerals where the coal does not exceed 16 2/3 percent of the total tonnage of coal and other minerals removed annually for purposes of commercial use or sale or coal explorations subject to this chapter; and

(B) the areas on which those activities occur or where those activities disturb the natural land surface, areas adjacent to land the use of which is incidental to any of those activities, all land affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of those activities and for haulage, and excavations, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas, and other areas on which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to those activities.

26

Tex. Nat. Res. Code § 134.004(20). It is undisputed that DRCP had begun construction of a sedimentation pond; fencing; performance of archeological studies; and monitoring, coring, drilling, and inspection of surface and groundwater, but the parties join issue on whether these activities constitute "surface coal mining operations." We are unpersuaded by MCEPHA's and Baxter's argument that to constitute surface coal mining operations, the operations must be incidental to the actual extraction of coal. Rather, before listing examples of what may constitute surface coal mining operations, section 134.004(20) broadly defines such operations as "activities . . . in connection with a surface coal mine or subject to the requirements of Section 134.015 incidental to an underground coal mine." *Id.* We conclude that DRCP's activities, though limited, are "in connection with a surface coal mine" within the meaning of section 134.004(20) and operated to preclude termination of the permit pursuant to section 134.072 for failure to begin operations.

We are similarly unpersuaded by Appellants' arguments that the permit was not a renewal because Supplement No. 1 "completely replaced" the 2004 application. While the examiner referred to Supplement No. 1 as a complete replacement of the 2004 renewal/revision application, she also stated that it "is now characterized a renewal/revision/expansion." Testimony reflects that the application "consists of the original application, filed in 2004, and six supplements, the first being filed in 2008." Further, the record reflects that while portions of the application sought revisions and expansion, other portions sought to renew the existing permit. On this record, we cannot conclude that the hearing examiner abused her discretion in treating the application as an application for a permit renewal/revision/expansion.

Further, the hearing examiner imposed different burdens of proof for the renewal portion and the revision/expansion portion. Order No. 9 stated: "At the pre-hearing conference, the examiner confirmed that the burden of proof is on parties opposing renewal of the application. The examiner further confirms that the burden of proof is on the applicant for new proposals." Similarly, the amended PFD reflects that the examiner distinguished between the statutory provisions and burdens of proof applicable to "[t]he portions of the permit proposing renewal of operations" and those applicable to "operations that are newly proposed or are revisions." Thus, the hearing examiner placed the burden of proof on Appellants with respect to the portion of the application concerning renewal issues and on DRCP with respect to the portion of the application concerning revision and expansion issues in accordance with the TSMRCA. *See id.* §§ 134.066(a), .075(b), .079, .080 (Commission may not approve permit revision unless reclamation as required under Act can be accomplished), .081 (requiring Commission to establish guidelines for permit revisions); *see also* 16 Tex. Admin. Code §§ 226 (Permit Revisions) (setting out requirement for permit revisions), .227(a), .230(a). We conclude that the examiner did not improperly shift the burden of proof. Nor do we agree that the Commission's final order, which adopted the examiner's PFD but did not specify the applicable burdens of proof, improperly shifted the burden of proof.[15] We overrule the City's and Hospital District's issue II(A) and MCEPHA's and Baxter's first issue.

---

[15] Appellants assert that by finding that DRCP had begun mining operations and improperly shifting the burden of proof, the final order violated their due process rights. However, they fail to present any discussion or analysis to support this contention and have therefore waived it. *See* Tex. R. App. P. 38.1(i). Even if they had not waived this argument, having concluded that the examiner did not improperly shift the burden of proof, we would further conclude that the final order did not violate Appellants' due process rights on that basis.

28

**Consolidated Record**

The City and the Hospital District, in their issue II(C), and the County, as part of its fourth issue, contend that the hearing examiner's refusal to require DRCP to provide a "consolidated record" violated the Administrative Code, the Rules of Civil Procedure, and their due process rights. However, the City and the Hospital District have offered no argument or analysis on this issue and have therefore waived it. *See* Tex. R. App. P. 38.1(i). The gist of the County's argument is that the repeated supplementations to the application, requiring the parties to work with 22 binders over more than seven years and distinguish between live and superceded portions, led to confusion, even on the part of the examiner. The County points out that the amended PFD deleted approval of a temporary road design because it had been eliminated from the application. At a preliminary hearing, the County moved that DRCP be required to provide a consolidated record so that the parties could quickly and reliably find materials during trial. Counsel for DRCP argued that eliminating the history of the application and supplements would actually make the application less clear. The hearing examiner acknowledged that in some cases Commission staff had asked applicants to replace sections of applications that had become unwieldy and difficult to review but stated that replacement is generally "never required" and declined to order DRCP to replace all or part of its application. Counsel for DRCP explained how to navigate the application, and the examiner instructed Commission staff to assist the parties in identifying live portions of the application during the hearing.

The County cites no statutory or regulatory provisions allegedly violated by the lack of a consolidated record, arguing only that the confusion and burden of the record violated

29

Appellants' due process rights. Intervenors and the Commission contend that Appellants have identified no legally cognizable harm from the examiner's decision other than a level of difficulty that is to be expected in a complex permitting proceeding, that Appellants were able to participate in a full and fair hearing and refer to the application as needed, and that the examiner's decision not to require a consolidated record did not deprive them of due process. Based on our review of the record, we agree. We overrule the City's and Hospital District's issue IIC) and the County's fourth issue as to a consolidated record.[16]

**Proposed Sedimentation Ponds**

In their issue III(A), the City and the Hospital District contend that the final order violates Commission Rule 12.148 regarding plans for proposed sedimentation ponds and, consequently, Rule 12.216. *See* 16 Tex. Admin. Code §§ 12.148 (Reclamation Plan: Ponds, Impoundments, Banks, Dams, and Embankments), .216(1) (requiring application to be accurate and complete and comply with the TSMRCA and Commission rules). MCEPHA and Baxter assert the same argument in their third issue. As part of Commission requirements that each application contain a plan for reclamation of the lands within the proposed permit area, Rule 12.148 requires the

---

[16] In its fourth issue, the County also argues that the cumulative weight of the procedural irregularities addressed in its first three issues, combined with the volume and unmanageable nature of the administrative record, deprived the parties of the minimum administrative due process they were due. "[T]he ultimate test of due process of law in an administrative hearing is the presence of rudiments of fair play long known to our law." *State v. Crank*, 666 S.W.2d 91, 94 (Tex. 1984). Having concluded that the hearing examiner did not abuse her discretion in the rulings challenged in the County's first three issues or in declining to require a consolidated record, we likewise conclude that the combined rulings did not deprive the parties of due process and overrule the remainder of the County's fourth issue.

application to include "a general plan for each proposed sedimentation pond . . . within the proposed permit area." *See id.* § 12.148(a). "Each general plan shall . . . contain a description, map, and cross section of the structure and its location." *Id.* § 12.148(a)(1)(B). Each plan must also contain a schedule of dates that any detailed design plans not submitted with the general plan will be submitted, and the detailed plans must be approved before construction begins. *Id.* § 12.148(a)(1)(E).

In its application, DRCP stated the number of sedimentation ponds it was proposing during the term of the permit and submitted a schedule of construction, with estimated construction years for ponds SP-1 through SP-7. SP-1 through SP-3 were proposed for construction in 2011 and 2013; SP-4 through SP-7 were proposed for construction in 2014. DRCP submitted detailed design plans for SP-1 through SP-3 and general design plans for ponds SP-4 through SP-7. The general design plans for SP-4 through SP-7 included a "typical" cross section for sedimentation ponds. The final order approved ponds SP-1 through SP-3 for construction and noted that "[d]etailed design plans for Ponds SP-4 through SP-7 . . . must be submitted to the Division and approved prior to construction of these ponds."

Appellants argue that because the application contained only a typical cross section for SP-4 through SP-7, it is incomplete, and the final order violates Commission Rules 12.148 and 12.216(1). *See id.* §§ 12.148(a), .216(1). Consequently, they contend, whether the ponds are designed in compliance with Commission Rules 12.344 and 12.347, as required by Commission Rule 12.148, is not known. *See id.* §§ 12.148(b) & (c), .344, (Hydrologic Balance: Siltation Structures), .347 (Hydrologic Balance: Permanent and Temporary Impoundments). Appellants further argue that because DRCP may submit design plans in the future, they are precluded from participating in the

31

decision, effectively circumventing their right to a hearing on the adequacy of the designs and abrogating their due process rights. We do not find these arguments persuasive.

Rule 12.148 requires each general plan to contain, among other things, a cross section of the pond structure. *See id.* § 12.148(a)(1)(b). DRCP submitted cross sections for SP-1 through SP-3, and the Commission approved them for construction. It submitted a typical cross section for SP-4 through SP-7, and the Commission did not approve them for construction, instead requiring DRCP to submit detailed plans prior to beginning construction. Rule 12.148 expressly contemplates subsequent submission and approval of detailed design plans. *See id.* § 12.148(a)(1)(E). Consequently, approval of the application as to SP-1 through SP-3 in the absence of detailed design plans for SP-4 through SP-7 does not violate Commission Rules 12.148 or 12.216(1).

Nor does it violate appellants' due process rights. As noted above, due process requires only one adequate hearing in an administrative proceeding. *See Browning-Ferris*, 644 S.W.2d at 127. The granting or refusal of further hearings on a matter that has previously been before the Commission on one or more earlier hearings is within the sound discretion of the Commission, and unless there is an abuse of discretion the courts do not interfere. *Id.* at 128 (citing *Pan Am. Petroleum Corp. v. Railroad Comm'n*, 335 S.W.2d 425, 430 (Tex. Civ. App.—Austin 1960, writ ref'd n.r.e.). As this Court recognized in *Browning-Ferris*, we rely on expert Commission staff to insure that modified or subsequent plans comply with Commission regulations, and if compliance is lacking, the Commission has powers of enforcement. *See id.*; *see also* Tex. Nat. Res. Code §§ 134.161–.183; 16 Tex. Admin. Code §§ 12.677–.684 (Enforcement). In short, Rule 12.148 contemplates submission of detailed design plans after approval of the application, and no statute

32

or rule requires notice and hearing upon subsequent submission of detailed plans unless deemed appropriate in the discretion of the Commission. We conclude that the Commission did not violate its own rules or Appellants' due process rights in approving DRCP's application prior to submission of detailed plans for SP-4 through SP-7 and requiring such plans be submitted and approved prior to construction. We overrule the City's and Hospital District's issue III(A) and MCEPHA and Baxter's third issue.[17]

**Air Pollution Control Plan**

In the City's and Hospital District's Issue I(C) and MCEPHA's and Baxter's fourth issue, Appellants argue that the final order violates Commission Rule 12.143 by approving the application without an air pollution control plan. *See* 16 Tex. Admin. Code § 12.143(a)(1), (2) (Air Pollution Control for Surface Mining).[18] MCEPHA and Baxter also assert that as a result, the final order also violates Commission Rule 12.216. *See id.* § 12.216 (requiring application to be accurate and complete and comply with the TSMRCA and Commission rules). Rule 12.143 requires that an application for a permit to surface mine coal include an air pollution control plan for fugitive-dust control practices in accordance with Commission Rule 12.389[19] and a monitoring program to ensure

---

[17] Appellants also assert that the application and final order violate the requirements of Commission Rules 12.148(b)–(c) and (f), 12.344, 12.347, and related federal rules. However, they offer no argument or citations to the record in support of this assertion and have therefore waived it. *See* Tex. R. App. P. 38.1(i).

[18] The proposed mine is required to comply with subsection (a) of Rule 12.143 because it is located west of the 100th meridian west longitude and proposes annual production in excess of 1 million tons of coal. *See* 16 Tex. Admin. Code § 12.143(a).

[19] Commission Rule 12.389 requires that exposed surface areas be protected and stabilized to control erosion and that rills and gullies that form be filled or stabilized, topsoil replaced, and the

33

that the dust control plan is effective.[20]  *See id.* § 12.143(a)(1), (2).[21]  Fugitive dust is defined as

"particulate matter not emitted from a duct or stack which becomes airborne due to the forces of

wind or surface coal mining operations or both."  *See id.* § 12.3(75) (Definitions).  Fugitive dust

includes such things as emissions from haul roads, wind erosion of exposed surfaces, and

reclamation operations.  *See id.*

Appellants argue that DRCP's application contained plans to control dust with water

or chemicals but did not identify sufficient water resources or the chemicals or present any real plan

to control dust beyond assertions that it would comply with the rules.  The record reflects that

DRCP's plan included "watering and/or chemical treatment for soil stabilization . . . as needed,"

"minimizing activity during high wind conditions and reducing equipment speed during all

areas reseeded or replanted.  *See id.* § 12.389.

[20]  The Commission asserts that the City has waived this issue by failing to assert it in its motion for rehearing.  However, the City's joint motion for rehearing with the Hospital District includes an argument that DRCP "[did] not submit[] a feasible air pollution control plan under section 12.143(a)(2) of the application . . . ." and that the dust control plan was inadequate.  Thus, at least as to the fugitive dust control plan, the City and the Hospital District have preserved this issue.  There is no dispute that MCEPHA and Baxter preserved this issue for review as to the dust control plan.  We address below, DRCP's contention that Appellants failed to raise this issue as to the monitoring program during the hearing.

[21]  Expert testimony reflected that emissions from stationary sources related to the mine—as opposed to sources related to actual mining—are governed by the Texas Clean Air Act and regulated by the Texas Commission on Environmental Quality (TCEQ).  *See generally* Tex. Health & Safety Code §§ 382.001–510.  TCEQ regulations cover such emissions sources as conveyor belts and coal-cleaning equipment.  For this aspect of air quality regulation, DRCP obtained a "permit by rule" from TCEQ (PBR).  A PBR may be issued to certain types of facilities that will not make a significant contribution of air contaminants to the atmosphere.  *See id.* §§ 382.05196, .057.  Expert testimony further reflected that emissions from actual mining activities and related emissions, such as from mobile equipment and vehicular traffic on dirt roads, are regulated by the Commission, and it is for these emissions that a dust control plan and monitoring program are required by Rule 12.143.

operations."  It also included vegetating or mulching roads, restricting travel on un-established roads, minimizing the area of disturbed land during mining, scraping and compacting unpaved roads and removing debris from roads, promptly revegetating regraded lands, restricting the area blasted at any one time, inspecting for burning when the potential for spontaneous combustion is high, and restricting other activities causing fugitive dust during periods of air stagnation.  There was evidence that the EPA had concluded that there would be no adverse health impact associated with dust emission based on modeling exercises done before implementation of a dust control plan and expert testimony that the dust control plan would add another "safeguard of protection" and was "adequate protection."  Commission Rule 12.143 does not require the applicant to identify water sources or specific chemicals to be used, *see id.* § 12.143, and there was Commission staff testimony to that effect.[22]  There was also expert testimony that the amount of water needed cannot be predicted in advance and can only be estimated, that the dust control plan was feasible, and that,

---

[22]    Intervenors' reliance on *BFI Waste Systems of North America, Inc. v. Martinez Environmental Group* is misplaced.  *BFI* involved TCEQ's regulation of solid waste facilities. *See* 93 S.W.3d 570, 574 (Tex. App.—Austin 2002, pet. denied).  BFI sought a permit to expand its landfill, the district court held that its site operating plan was insufficient, and this Court agreed. *See id.* at 573, 580.  The applicable TCEQ rule defines "the basic elements for an application" and provides that "[a]ll aspects of the application and design requirements must be addressed." *See* 30 Tex. Admin. Code § 330.57(d) (Tex. Comm'n on Envtl. Quality, Permit and Registration Applications for Municipal Solid Waste Facilities).  The court observed that instead of setting out specific operating procedures, TCEQ had opted to issue rules consisting of general requirements that allowed landfill operators to develop procedures tailored to their individual sites, that the specific procedures had to be included in a detailed site operating plan, and that deviation from an approved plan would be deemed a violation of the rule. *See BFI Waste Sys.*, 93 S.W.3d at 580 ("[TCEQ] has rejected a one-size-fits-all approach to regulation . . . .").  In contrast, the Commission has not adopted rules setting out only the basic elements for an application and requiring applicants to develop individualized plans that comply with those general requirements.  Instead, Rule 12.143 sets out specific requirements for an air pollution control plan for surface mining and assesses all applications against those requirements.  We do not find *BFI* controlling here.

35

in fact, the mine "has a better control plan for fugitive dust emissions than other mine sites . . . I've seen." We conclude that there is substantial evidence to support the Commission's conclusion that DRCP's fugitive dust control plan complies with the requirements of Commission Rule 12.143. *See* Tex. Gov't Code § 2001.174; *Texas Indus. Energy Consumers*, 324 S.W.3d at 105; *Mireles*, 9 S.W.3d at 131.

Commission Rule 12.143 also requires a monitoring program to evaluate the effectiveness of the proposed fugitive dust control practices to comply with state and federal air quality standards. *See* Tex. Admin. Code § 12.143. Appellants complain that DRCP developed a program to monitor particulate matter less than 10 microns ($PM_{10}$) instead of particulate matter less than 2.5 microns ($PM_{2.5}$) despite the existence of federal National Ambient Air Quality Standards (NAAQS) for $PM_{2.5}$ and evidence that the mine will be a source of $PM_{2.5}$. Appellants contend that DRCP relied on "an out-dated and inapplicable surrogacy policy (i.e. using $PM_{10}$ compliance as a surrogate for $PM_{2.5}$ [compliance]." DRCP asserts that Appellants did not raise the issue of compliance with $PM_{2.5}$ or introduce any evidence concerning the $PM_{2.5}$ standard during the hearing. Although MCEPHA and Baxter did raise this issue in their motion for rehearing, in our review of the record, we have not located—and Appellants have not pointed us to—where Appellants raised this issue during the hearing. Thus, it appears that Appellants have waived this complaint.

Even assuming Appellants have not waived this complaint, there was expert testimony that, while coal mining operations are sources of $PM_{2.5}$, only 19% of the particulate matter is less than 10 microns, and the EPA has determined that only three to six percent of the particulate

matter emitted is less than 2.5 microns. There was also expert testimony that there would be no benefit to monitoring for $PM_{2.5}$ because it is such a small fraction of the $PM_{10}$ emissions and because it is possible to estimate $PM_{2.5}$ levels "by using one of the EPA's factors to the $PM_{10}$ data that's collected and see if that shows a significant impact or not." Further, although the surrogacy program ended some 18 months prior to the Commission's final order, *see* 76 Fed. Reg. 28,646 (May 18, 2011) (codified at 40 C.F.R. pt. 52), there was expert testimony that the implementation of the $PM_{2.5}$ standard was very recent, that the state was still working out how to implement it and when it was going to require it, and that both the state and the EPA had determined that compliance with $PM_{2.5}$ standards could be demonstrated by compliance with $PM_{10}$ standards. There was also evidence that DRCP had monitored air quality at the site since 2004 by measuring $PM_{10}$ levels and had established a set of baseline results by which to assess the effectiveness of the dust-control practices it implemented. Thus, we conclude that there is substantial evidence to support the Commission's determination that DRCP's monitoring program complies with Rules 12.143 and 12.216(1).[23] *See* Tex. Gov't Code § 2001.174; *Texas Indus. Energy Consumers*, 324 S.W.3d at 105; *Mireles*,

---

[23] Appellants also assert that the Commission's approving an application that does not contain an adequate air pollution control plan violates their due process rights by precluding them a hearing on the plan DRCP will use. Having concluded that there is substantial evidence that the application contains an adequate plan, we further conclude that approval of the plan does not violate Appellants' due process rights. In addition, Appellants have failed to allege the deprivation of any protected property or liberty interest and have therefore failed to state a due process claim. *See Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 560–61 (Tex. 1985); *City of Arlington v. Centerfolds, Inc.*, 232 S.W.3d 238, 248–49 (Tex. App.—Fort Worth 2007, pet. denied); *KEM Tex., Ltd. v. Texas Dep't of Transp.*, No. 03-08-00468-CV, 2009 Tex. App. LEXIS 4894, at *18–19 (Tex. App.—Austin June 26, 2009, no pet.) (mem. op.).

9 S.W.3d at 131.  We overrule the City's and Hospital District's Issue I(C) and MCEPHA's and Baxter's fourth issue.

**Blasting Plan**

In the City's and Hospital District's Issue I(B) and MCEPHA's and Baxter's fifth issue, Appellants argue that the final order, in particular Finding of Fact 44, errs because the required blasting plan fails to comply with sections 134.042 and 134.092(a)(15) of the TSMRCA and Commission Rules 12.141 and 12.216.  *See* Tex. Nat. Res. Code §§ 134.042, .092(a)(15); 16 Tex. Admin. Code §§ 12.141 (Operation Plan: Blasting), .216(1) (requiring application to be accurate and complete and comply with the TSMRCA and Commission rules).  Section 134.042 provides that "[a]n applicant for a surface coal mining and reclamation permit shall submit to the commission as part of its application a blasting plan that outlines the procedures and standards by which the operator will comply with Section 134.092(a)(15)."  Tex. Nat. Res. Code § 134.042.  Section 134.092(a)(15) requires an operator "to ensure that explosives are used in accordance with state and federal law, including commission rules."  *Id.* § 134.092(a)(15).  Commission Rule 12.141 provides that "[e]ach application shall contain a blasting plan for the proposed permit area, explaining how the application will comply with the requirements of §§ 12.357–12.360 and 12.362 of this title . . . ."  16 Tex. Admin. Code § 12.141; *see id.* § 12.357 (Use of Explosives: General Requirements), .358 (Use of Explosives: Pre-Blasting Survey), .359 ( Use of Explosives: Blasting Schedule), .360 (Use of Explosives: Control of Adverse Effects), .362 (Use of Explosives: Records of Blasting Operations). Rule 12.141 further requires that the blasting plan include the "types and approximate amounts of explosives to be used for each type of blasting operation to be conducted" and descriptions of seven

38

other aspects of the blasting procedures, including a "description of methods to be applied in controlling adverse effects of blasting operations." *See id.* § 12.141(1)–(8). In addition, Commission Rule 12.357 requires a "blast design" if blasting operations will be conducted within 1,000 feet of certain public buildings or within 500 feet of certain facilities including underground mines. *Id.* § 2.357(d)(1). The blast design may be included in the application or submitted at a later time, before the blast, approved by the Commission. *Id.* §12.357(d)(2).

Appellants contend that DRCP's blasting plan is legally deficient because it does not contain the required basic elements. In particular, they complain that it omits the approximate amounts of explosives to be used and "relies on mere hypotheticals." *See id.* § 12.141(1). The record reflects that DRCP's blasting plan initially failed to include approximate amounts of explosives to be used, and Commission staff noted a deficiency in its technical analysis. However, in a subsequent technical analysis, staff noted that in a supplement to the application, DRCP "used the scaled distance formula to calculate the maximum amount of explosives to be used," concluded that the "information now meets the requirements of Rule 12.141(1)," and withdrew the deficiency. The Commission's mining engineer also testified that the use of the scaled distance equation met Commission requirements, specifically Rule 12.360. Appellants also complain that the plan does not include a description of the methods to be applied in controlling the adverse effects of blasting. *See id.* § 12.141(8). DRCP's blasting plan stated that blasting would be conducted in a manner to prevent injury or damage outside the permit area, that blasting would not be conducted in an area covered by Rule 12.357(d), and that flyrock would not be cast beyond the limits specified in Rule 12.360(g), but that if there was potential for that to occur, blasting mats would be used. Commission

39

staff concluded that "[t]he information provided in the application, as supplemented, is adequate to address the requirements of § 12.141." The Commission's mining engineer also testified that the blasting plan explained how DRCP would comply with Commission Rules 12.267 through 12.360 and that the plan met the basic requirements for blasting plans. DRCP's expert witness testified that the information contained in the plan was sufficient under Rule 12.141. Even MCEPHA's expert mining witness, although opining that the plan did not meet industry standards, acknowledged that "[i]t definitely does meet the Railroad Commission standard."[24] We conclude that substantial evidence supports the Commission's finding that DRCP's application contains a general blasting plan in compliance with Rules 12.141 and 12.216(1). *See* Tex. Gov't Code § 2001.174; *Texas Indus. Energy Consumers*, 324 S.W.3d at 105; *Mireles*, 9 S.W.3d at 131.[25] We overrule the City's and Hospital District's Issue I(B) and MCEPHA's and Baxter's fifth issue.

---

[24] Appellants cite the testimony of two other experts in support of their argument that the blasting plan does not meet the requirements of Rule 12.141. DRCP's mining expert testified that there was no specific blasting plan at the time but that if blasting was needed, the applicant would get a certified blaster and "work up a blasting plan that satisfies people." CRF's president similarly answered, "No, it's not" when asked if section 141 of DRCP's application was a blasting plan. Appellees contend that the totality of these witnesses' testimony reflects that they were referring to a blast design required under Rule 12.357, not the blasting plan required under Rule 12.141. We agree. When these statements are read in the context of the remainder of their testimony and the content of Rules 12.141 and 12.357, it is apparent that they refer to a blast design, which may be submitted after the application, not to a blast plan, which must be included in the application.

[25] Appellants also assert that because the plan does not comply with TSMRCA sections 134.042 and 134.092(a)(15) and Commission Rules 12.141 and 12.216, the decision deprived them of due process, but having offered no discussion or analysis on this argument, have waived that argument. *See* Tex. R. App. P. 38.1(i). Even if they had not waived this argument, having concluded that there is substantial evidence that the application contains an adequate blasting plan, we would also conclude that the final order does not violate Appellants' due process rights on that basis.

**Protection of Cultural and Historic Resources**

In the City's and Hospital District's Issue III(B) and MCEPHA's and Baxter's sixth issue, Appellants argue that the final order is invalid because the Commission failed to comply with the National Historic Preservation Act (NHPA) and related legal requirements. The NHPA authorizes the maintenance and expansion of a "National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." 16 U.S.C. § 470a(a)(1)(A).[26] Section 106 of the NHPA provides that, prior to approval of expenditure of federal funds, the head of any federal agency must take into account the effect of the undertaking on any district, site, building, structure, or object eligible for inclusion in the National Register and afford the Advisory Council on Historic Preservation established under the NHPA the opportunity to comment. *See id*. § 470f (section 106).[27] "The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties . . . ." 36 C.F.R. 800.1(a). The agency official involved must consult with the state historical preservation officer, Indian tribes and Native Hawaiian organizations, representatives of local governments, and individuals and organizations with a demonstrated interest. *See* 36 C.F.R. 800.2(c).

---

[26] Section 470a, in effect at the time of the hearing and appeal to the district court in this case, was subsequently repealed and editorially transferred in the enactment of Title 54, National Park Systems and Related Programs. *See* Pub. L. 113–287, § 7, 128 Stat. 3094, 3272 (2014).

[27] Section 470f, in effect at the time of the hearing and appeal to the district court in this case, was subsequently repealed and editorially eliminated in the enactment of Title 54, National Park Services and Related Programs. *See Id.*

The record reflects that, in accepting federal funds for the state program to regulate surface coal mining and reclamation operations, the Commission agreed to implement historic preservation provisions in the state program "in a manner consistent with the assurance [it] provided . . . to assist the OSM in meeting its responsibilities with Section 106 of the [NHPA]." Accordingly, the Commission issued rules providing for historical preservation. *See* 16 Tex. Admin. Code §§ 12.125(2) (General Environmental Resources Information) (requiring application to identify cultural, historic, and archeological resources listed on or eligible for listing on National Register and known archeological sites), .151 (Protection of Public Parks and Historic Places) (requiring applicant to prevent adverse impacts on public parks and places listed on National Register and authorizing Commission to require protection through mitigation and treatment measures). The Commission complied with Rules 12.125(2) and 12.151 through a Memorandum of Understanding (MOU) entered into with the Texas Historical Commission (THC). Under the MOU, the Commission forwarded the application to THC, which reviewed it for compliance with historical preservation requirements and provided a response and recommendations to the Commission.

The City and the Hospital District argue that "the Commission and other authorities failed to notify and/or consult with recognized Indian Tribes as required by the [NHPA]." However, the City and the Hospital District do not have standing to assert the interests of third parties who allegedly did not receive notice. *See McDaniel v. Texas Nat. Res. Conservation Comm'n*, 982 S.W.2d 650, 654 (Tex. App.—Austin 1998, pet. denied) (landowner had no standing to complain of agency's alleged failure to provide notice of proposed solid waste disposal site to other landowners); *Smith v. Houston Chem. Servs., Inc.*, 872 S.W.2d 252, 273 (Tex. App.—Austin 1994,

writ denied) (opponent to Texas Water Commission's issuance of permit could not be prejudiced by permit applicant's failure to notify another person) (citing Tex. Gov't Code § 2001.074(2), requiring reversal or remand of agency decision if appellant's substantial rights have been prejudiced). We therefore decline to address this argument of the City and the Hospital District.[28] *See McDaniel*, 982 S.W.2d at 654.

The City and the Hospital District also contend that the City was not consulted concerning historical properties and "asserts its rights pursuant to the Act" to be consulted. The Hospital District has no standing to assert this argument, and we do not address it as to the Hospital District. *See id.* The City offers no argument or citation to the record in support of this contention and has therefore waived it. *See* Tex. R. App. P. 38.1(i). Having offered no argument, the City has also failed to establish the requisite harm for reversible error. *See id.* R. 44.1. Likewise, the City and the Hospital District have failed to offer any argument or citation to the record in support of their assertion that THC is a necessary party to this matter or in support of their argument that these

---

[28] To the extent MCEPHA and Baxter also assert lack of notice to the Indian Tribes, we reach the same conclusion as to their lack of standing. *See McDaniel v. Texas Nat. Res. Conservation Comm'n*, 982 S.W.2d 650, 654 (Tex. App.—Austin 1998, pet. denied). Because we do not reach this issue, we do not address Appellants' arguments concerning the validity of the MOU as a means of meeting the notice requirement or MCEPHA's and Baxter's arguments that use of the "unpublished" MOU violated their due process rights.

Even if Appellants had standing to raise this issue, the record reflects that the EPA conducted the required notice and consultation. There is evidence that EPA consulted with the Kickapoo, Comanche, and Mescalero Apache Tribal Councils in 1994 when DRRC filed the application, and that the Kickapoo Tribe accepted, indicating tribal lands of interest in Maverick, the Comanche Tribe declined, indicating no tribal lands were affected, and the Mescalero Apache Tribe did not respond. The record also reflects that the Kickapoo participated in the hearing on the application for renewal/extension until withdrawing its objections, and there was evidence that Commission staff determined that the application complied with Commission Rules 12.125(2) and 12.151.

43

alleged errors violated their due process rights and have waived these contentions as well. *See id.* R. 38.1(i). We overrule the City's and Hospital District's Issue III(B).

MCEPHA and Baxter argue that the permit is premature because it violates the timing provision of the NHPA regulations, which requires that "[t]he agency official must complete the section 106 process 'prior to the approval of the expenditure of any federal funds on the undertaking.'" *See* 36 C.F.R. § 800.1(c). However, as shown by its express language, the regulation applies to the expenditure of federal funds by federal agencies. *See Pochucha*, 290 S.W.3d at 867 (our primary concern is express statutory language). Historical preservation Rules 12.125(2) and 12.151, issued by the Commission to assist the OSM in meeting its section 106 requirements, contain no such timing rule. Further, the record reflects that there are 11 sites that were listed in the National Register or require further testing to determine their eligibility for listing and that there will be no "mining activities" whatsoever prior to determination of whether the yet undetermined sites are eligible.

In a seemingly unrelated argument, MCEPHA and Baxter argue that the "jurisdictional" notices required under Commission Rule 12.207 "are missing." Rule 12.207, unrelated to the historical preservation requirements, provides that written notification of a permit application shall be sent to specified state agencies and federal, state, and local agencies with jurisdiction over or an interest in the area of proposed mining operations. *See* 16 Tex. Admin. Code § 12.207(c) (Public Notices of Filing of Permit Applications). MCEPHA and Baxter offer no authority for their assertion that notices under Rule 12.207 are jurisdictional. In the absence of a jurisdictional requirement of notice, MCEPHA and Baxter have no standing to complain of a lack of notice to third

44

parties. *See McDaniel*, 982 S.W.2d at 654. Further, even if the Rule 12.207 notice requirements are jurisdictional, the record reflects that the requisite notices were sent. In an effort to clarify confusion concerning the various notice requirements, the hearing examiner stated that "the rules require that the Commission send mailed notice to various federal agencies," that "these . . . public notices that were required [are] in the record and they can certainly be viewed by anyone," and that "they were accepted into the record earlier in the proceeding." We overrule MCEPHA's and Baxter's sixth issue.

**Wildlife Protection**

In the City's Issue I (opening paragraph) and I(D) and MCEPHA and Baxter's seventh issue, Appellants argue that the final order errs because the application failed to use the best technology currently available to enhance wildlife resources in violation of sections 134.091 and 134.092 of the TSMRCA and Commission Rules 12.380, 12.144, and 12.216. *See* Tex. Nat. Res. Code §§ 134.091, .092; 16 Tex. Admin. Code §§ 12.144 (Fish and Wildlife Plan), 216(1) (requiring application to be accurate and complete and comply with the TSMRCA and Commission rules to be approved), .380 (Protection of Fish, Wildlife, and Related Environmental Values). Section 134.091 provides that a permit shall require that coal mining operations meet the "applicable performance standards of this chapter." Tex. Nat. Res. Code § 134.091. Section 134.092 sets out performance standards that include requiring mining operations to minimize disturbance and adverse impacts of the operations on wildlife and to enhance wildlife resources to the extent possible using the best technology currently available. *See id.* §134.092(a)(24). Commission Rules 12.144 and 12.380 implement section 134.092(a)(24) by requiring an operator, to the extent possible, to use the

best technology currently available to minimize impacts on wildlife and enhance wildlife resources and to include in the application a description of how such minimization and enhancement will be achieved. *See* 16 Tex. Admin. Code §§ 12.144, .380. DRCP's plan calls for committing not to mine the main channel of Elm Creek, maintaining a 200 foot buffer zone on each side of the main channel, and limiting clearing within 100 feet of the buffer zone to daylight hours. Other measures set out in DRCP's plan include the reclamation of original vegetation types, the addition of new species, minimization of the amount of potential habitat that will be modified at any one time, the avoidance or minimization of the use of pesticides and herbicides, erosion control measures to minimize impacts to surface waters, and education of employees and contractors regarding the recognition of endangered wildcats and their habitat.

Appellants argue that the measures DRCP took are insufficient. They contend that endangered ocelot and jaguarundi will be adversely affected during the active mining phase and that resources available to the cats will not be enhanced. Specifically, MCEPHA and Baxter argue that based on evidence that the noise from mechanical equipment will extend beyond the permit boundary, it follows that the noise effects will extend to Elm Creek and the buffer zone. They cite expert testimony that the cats do not like noise and that it, along with lights and movement of people, will change their feeding, breeding, or sheltering behavior. MCEPHA and Baxter further contend that these effects will constitute the type of harm that constitutes a "take" under the Endangered Species Act (ESA) and implementing regulations.[29] They also complain that DRCP's wildlife

---

[29] The ESA prohibits the "take" of any wildlife listed as endangered or threatened pursuant to procedures outlined in the ESA. *See* 16 U.S.C. § 1538(a)(1)(B) (defining prohibited acts); *see also id.* §1533 (setting out procedure for determination of endangered and threatened species). The

protection plan does not include berms on each side of the buffer zone despite expert testimony that they are technically feasible and would reduce the noise level in the Elm Creek corridor. Because there was evidence that the cats use areas beyond their core habitat, they argue that the buffer should be wider. MCEPHA and Baxter also cite testimony that DRCP's plan to mine tributaries of Elm Creek will leave the permit area with corridors that do not connect, perhaps causing the cats to abandon the corridor.

MCEPHA and Baxter further claim that DRCP will not use the best technology currently available in reclaiming the tributaries, pointing to testimony that there will not be a greater concentration of seedlings in the low lying riparian areas that grow more brush and are favored by the cats and testimony that 20 years from now DRCP will have restored the vegetation to its current state, without any enhancement. They urge that DRCP's plan to direct employees who observe a cat to report it to the Commission, which will report it to the U.S. Fish and Wildlife Service, should be enhanced by the use of trail cameras to monitor significant impairments in behavior patterns. They also argue that the proposed construction road just outside the buffer zone will endanger the cats and if it is constructed, traffic should be limited to daylight hours because the cats are nocturnal.

---

ESA defines "take" of an endangered or threatened species as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Harm" is defined to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. 17.3. "Harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to [listed species] by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.* Rule 12.144 requires the Commission to comply with the ESA. *See* 16 Tex. Admin. Code § 12.144.

47

Commission Rule 12.144 specifies that enhancement may include such measures as "restoration of streams and other wetlands, retention of ponds and impoundments, establishment of vegetation for wildlife food and cover, and the placement of perches and nest boxes." *See* 16 Tex. Admin. Code § 12.144(3)(B). The record reflects that DRCP's plan includes several of these measures. The reclamation plan calls for the reclamation of original species of vegetation, the addition of native and locally adapted species that are dependent only on rainfall as a source of water and that will provide additional food and cover for wildlife, and management to prevent invasive species. The plan also provides for the construction of containment ponds that may provide additional resting places for wildlife. The hearing examiner further found that the decision not to mine Elm Creek, when DRCP could have requested to do so, and to preserve a buffer zone are enhancements.

The record also contains a Biological Opinion prepared by the U.S. Department of the Interior's Fish and Wildlife Service. The Commission's natural resource specialist testified that the Biological Opinion reflects the best technology currently available. The Wildlife Service concluded that the proposed mine "is not likely to jeopardize the continued existence of the listed ocelot and jaguarundi. There is no critical habitat listed in the state of Texas for these species of cats, therefore none will be affected." The Wildlife Service also concluded that any "take" of the cats would be incidental, i.e., "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity" and that, given DRCP's proposed measures, it "is not likely to result in jeopardy to ocelot or jaguarundi." In addition, three witnesses testified that DRCP's plan complies with Commission rules. While all of the wildlife experts agreed that the mining will affect the behavior of the cats, they also offered testimony indicating that the effects would be minimal or temporary.

48

A zoologist testified that the cats' reactions to noise are very "individualized" and that some have no reaction at all, that the nocturnal cats would be moving through the Elm Creek corridor, not sleeping in it, that the cats will be somewhat protected from lights and noise in Elm Creek, and that he had studied the permit area and had never seen any of the dense thorn brush habitat suitable for the cats' dens. He also testified that the cats are very adaptable and can move ahead and to the sides of the slow-moving mining operations that will be done in narrow strips followed by reclamation.

The zoologist also testified that berms on the sides of the buffer zone would be detrimental because it would disrupt the natural drainage patterns, cause potential wetlands, and interfere with smaller animals' access to the creek. The Wildlife Service concluded that the proposed buffer zone is sufficient, and the Commission's natural resources specialist testified that while DRCP's plan calls for planting the same number of seedlings in low-lying area as in the uplands, more seedlings survive in lower areas, resulting in "denser vegetation as time goes on in reclamation." On this record, we conclude that substantial evidence supports the Commission's determination that DRCP's plan uses the best technology currently available to comply with Commission Rule 12.144 and related provisions.[30] *See* Tex. Gov't Code § 2001.174; *Texas Indus. Energy Consumers*, 324 S.W.3d at 105; *Mireles*, 9 S.W.3d at 131. We overrule the City's Issue I and I(D) and MCEPHA and Baxter's seventh issue.

---

[30] Appellants assert that because DRCP's plan does not reflect the best technology available to minimize adverse effects on the cats, the final order approving the plan violated their due process rights. However, they fail to present any discussion or analysis to support this contention and have therefore waived it. *See* Tex. R. App. P. 38.1(i). Even if they had not waived this argument, having concluded that there is substantial evidence that the plan complies with the applicable statutory provisions and rules concerning wildlife protection, we would also conclude that the final order does not violate Appellants' due process rights on that basis.

49

**Alternative Water Sources**

In their Issue I(A), the City and the Hospital District argue that the final order errs because DRCP's application fails to identify alternative water sources that could be developed to "replace" existing water sources. Therefore, they contend, the final order violates Commission Rules 12.130 and 12.216. *See* 16 Tex. Admin. Code §§ 12.130 (Alternative Water Supply Information), 12.216(1) (requiring application be accurate and complete and comply with the TSMRCA and Commission rules to be approved). Rule 12.130 provides that "[i]f contamination, diminution, or interruption may result, then the application shall identify the alternative sources of water supply that could be developed to replace the existing water sources . . . ." *Id.* This rule is related to the statutory performance bond requirement that a mine operator replace the water supply of a property owner whose water supply is contaminated, diminished, or interrupted as a proximate result of the coal mining operation. *See* Tex. Nat. Res. Code § 134.110.

Appellants contend that DRCP failed to meet this burden. In support of this contention, they cite the Commission's finding that the application sets out as alternative water sources wells, water from sedimentation ponds, and trucked water, with no mention of whether these sources are sufficient to replace existing water sources. Appellants further complain of the findings that water rights "may" be obtained and that DRCP has contracted with the City of Eagle Pass to provide potable water, without accounting for the fact that the contract with the City of Eagle Pass has expired. They cite testimony that the Commission found initial deficiencies concerning compliance with Rule 12.130 and accepted submission of the now-expired water supply agreement as evidence of compliance. They argue that because the contract—which they allege was the only basis upon

50

which the Commission approved the "previous iteration of the permit application"—is no longer in existence, DRCP failed to establish that there are any alternative sources of water supply capable of replacing existing water supplies. Consequently, they contend, the final order violates Rules 12.130 and 12.216.

Initially, we observe that the record reflects that DRCP did not identify any downstream surface water rights that might be affected and identified only five groundwater wells that might be affected. There was expert testimony that those five wells would not be affected because they are not hydrologically connected. Rule 12.130 provides:

> The application shall identify *the extent to which* the proposed surface mining activities may proximately result in contamination, diminution, or interruption of an underground or surface source of water within the proposed permit or adjacent areas . . . . *If* contamination, diminution, or interruption may result, *then* the application shall identify the alternative sources of water supply . . . .

*Id.* (emphasis added). Because the record reflects that no surface or groundwater sources may be contaminated, it appears from the plain language of Rule 12.130 that DRCP was not required to identify alternative water sources. *See id.*; *Marks*, 319 S.W.3d at 663. Nonetheless, it appears from the record that the Commission required that DRCP identify alternate water supply sources and DRCP complied.

The record reflects that DRCP identified as alternate sources: drilling water wells and pumping to the affected property owners, trucking in potable water, and contracting with the City of Eagle Pass and pumping water to affected property owners. There was testimony and documentary evidence that the initial deficiency in identifying alternative water sources was cured

51

when DRCP supplemented the application and listed the above alternative sources and that the application then sufficiently identified alternative water sources and met the requirements of Rule 12.130. The Commission found that DRCP had identified the above alternative water sources and noted that the contract with the City of Eagle Pass may have expired. Thus, the contract did not form the sole basis of the staff's conclusion or the Commission's finding that DRCP had complied with Rule 12.130, and the application was found in compliance without the certainty of the contract with the City of Eagle Pass. We conclude that substantial evidence supports the Commission's determination that DRCP's application met the requirements of Rules 12.130 and 12.216(1).[31] *See* Tex. Gov't Code § 2001.174; *Texas Indus. Energy Consumers*, 324 S.W.3d at 105; *Mireles*, 9 S.W.3d at 131. We overrule the City's and the Hospital District's issue I(a).

**Insurance Requirements**

In their fourth issue, the City and Hospital District argue that the final order fails to establish that DRCP obtained the required insurance coverage in violation of sections 134.052 and 134.053 of the TSMRCA and Commission Rule 12.311. *See* Tex. Nat. Res. Code §§ 134.052, .053; 16 Tex. Admin. Code § 12.311 (Terms and Conditions for Liability Insurance). Section 134.052 requires that the application contain "a certificate satisfactory to the commission that the applicant has a public liability insurance policy as described by Section 134.053 . . . ." *See* Tex. Nat.

---

[31] Appellants assert that because the order does not comply with Rules 12.130 and 12.216, it violated their due process rights. However, they fail to present any discussion or analysis to support this contention and have therefore waived it. *See* Tex. R. App. P. 38.1(i). Even if they had not waived this argument, having concluded that there is substantial evidence that the application complies with Rules 12.130 and 12.216, we would also conclude that the final order does not violate Appellants' due process rights on that basis.

52

Res. Code § 134.052(a)(19). Section 134.053 provides that the insurance required by section 134.052(a)(19) "shall provide for personal injury and property damage protection in an amount adequate to compensate a person who is (1) damaged as a result of surface coal mining and reclamation operations, including the use of explosives; and (2) entitled to compensation under state law." *Id.* § 134.053. The Commission promulgated Rule 12.311 to implement sections 134.052 and 134.053. Rule 12.311 provides:

> (a) The Commission shall require the applicant to submit at the time of permit application, a certificate certifying that the applicant has a public liability insurance policy in force for the surface coal mining and reclamation operation for which the permit is sought. The certificate shall provide for personal injury and property damage protection in an amount adequate to compensate all persons injured or property damaged as a result of surface coal mining and reclamation operations, including use of explosives and damage to water wells, and entitled to compensation under the applicable provisions of state law. Minimum insurance coverage for bodily injury shall be $500,000 for each occurrence and $1,500,000 aggregate; and minimum insurance coverage for property damage shall be $500,000 for each occurrence and $1,000,000 aggregate.

16 Tex. Admin. Code § 12.311(a). The Commission addressed compliance with insurance requirements in Finding of Fact No. 22 as follows:

> The record of this proceeding contains a certificate of insurance in compliance with § 12.120 of the Regulations [which requires a permit application to contain either a certificate of liability insurance or evidence that self-insurance requirements are satisfied] that evidences liability insurance coverage in amounts equal to, or exceeding, those required by § 12.311 of the Regulations. The form of this certificate has been approved by the Texas Department of Insurance. This section of the application, as it has been supplemented in the record of the public hearing with this certificate, and testimony by applicant's witness Don Grischow, [footnote omitted] is in compliance with the Regulations. Minimum insurance coverage for bodily injury must be $500,000 for each occurrence and $1,500,000 aggregate; and minimum insurance coverage for property damage must be $500,000 for each occurrence and $1,000,000 aggregate. The policies included in the record of the proceeding together

53

contain an amount for insurance meeting the minimum amounts required. The general liability policy . . . contains the following coverage: $1,000,000 bodily injury coverage per occurrence and $10,000,000 aggregate, and $1,000,000 property damage per occurrence and $10,000,000 aggregate. Exhibit 36 is the pollution policy with the following coverage: $1,500,000 per pollution condition with $1,500,000 aggregate.

Appellants argue that Finding of Fact 22 fails to state what activities are covered, that the Commission failed to address the distinction between coverage "per occurrence," which the certificate and finding reflect, and coverage "per person," and that $1 million per occurrence is insufficient. They also argue that the policy excludes coverage for silica related injuries and that although DRCP's expert insurance witness testified that silica injuries are covered under the pollution policy, the expert was unable to give a definite answer as to whether silica could be excluded under the pollution policy as a naturally occurring substance. Appellants contend that expert medical testimony that there is nothing in the relevant scientific literature to suggest that typical non-occupational exposure to crystalline silica would lead to respiratory disease "cannot excuse [DRCP] from complying with the statutory provisions requiring adequate compensation for injuries resulting from mining operations . . . ." Appellants further argue that DRCP's new 2013 policy, obtained after the hearing, excludes medical expenses and that there is no evidence that the operator, Camino Real, which owns no assets, has the ability to pay the premiums. We do not find these arguments persuasive.

Finding No. 22 addresses DRCP's compliance with requirements for liability insurance. The record reflects that the insurance policies are for operations at the mine. While Finding No. 22 does not state the activities covered, it is implicit from the Commission's other

findings of fact that the insurance is for surface coal mining and reclamation operations, and we conclude that the final order sufficiently states the underlying facts. *See* Tex. Gov't Code § 2001.141(d) (requiring final order to include concise statement of underlying fact supporting findings). Further, under TSMRCA sections 134.052 and 134.053, the Commission has discretion to determine whether the certificate states coverage that is "adequate" to compensate a person who is damaged and entitled to compensation under state law. Tex. Nat. Res. Code §§ 134.052, .053. Appellants have not presented any analysis or citation to the record in support of their assertion that "per occurrence" coverage is insufficient and have therefore waived that argument. *See* Tex. R. App. P. 38.1(1). Even if they had not waived the argument, Rule 12.311 specifies minimum coverages "per occurrence," and the record reflects that DRCP's coverages exceed the minimum requirements. Further, there is no requirement in the TSMRCA or Commission rules that the applicant provide evidence of sufficient assets to pay premiums. As for coverage for silica-related injuries, there was testimony that the coverage for bodily injury was not limited to the permit area and that it included coverage for injury from air pollution, including coal dust and silica. Appellants have not offered any argument or citation to the record to support their contention that DRCP's new policy excludes medical payments and have therefore waived that argument. *See id.* We conclude that the record contains substantial evidence to support the Commission's finding that DRCP obtained the required insurance coverage. *See* Tex. Gov't Code § 2001.174; *Texas Indus. Energy Consumers*, 324 S.W.3d at 105; *Mireles*, 9 S.W.3d at 131. We overrule the City's and Hospital District's issue IV.

**CONCLUSION**

Having overruled Appellants' issues, we affirm the district court's judgment affirming the Commission's final order granting the application of Dos Republicas Coal Partnership (DRCP) for renewal, revision, and expansion of its surface coal mining and reclamation permit.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   December 29, 2015